### UNITED STATES DISTRICT COURT
### DISTRICT OF CONNECTICUT

| | |
|---|---|
| Saba Mahmud, | |
| Plaintiff, | Civil No. 3:19-CV-01666-TOF |
| v. | |
| Andrew Saul, Commissioner of Social Security, | |
| Defendant. | November 23, 2020 |

### <u>RULING ON PENDING MOTIONS</u>

The Plaintiff, Saba Mahmud, appeals the final decision of the Defendant, Andrew Saul, Commissioner of Social Security ("the Commissioner"), on her application for Title II Social Security Disability Insurance benefits. This appeal is brought pursuant to 42 U.S.C. § 405(g). Currently pending are the Plaintiff's motion to reverse and remand for an award and calculation of benefits, or in the alternative, for an order to reverse and remand for a new hearing (ECF No. 15) and the Defendant's motion to affirm the decision of the Commissioner. (ECF No. 16.) For the reasons explained below, the Plaintiff's motion to reverse the decision of the Commissioner is **DENIED**, and the Commissioner's motion to affirm is **GRANTED**.

The Plaintiff raises several arguments on appeal. First, she argues that the Administrative Law Judge ("ALJ") erred at Step Three of the five-step sequential disability analysis when he concluded that her narcolepsy did not satisfy Listing 11.02, because he did not determine the frequency of her narcoleptic episodes before reaching that conclusion. (ECF No. 15-2, at 6-8.) Second, she argues that the ALJ failed to develop the record by not obtaining certain treatment records. (*Id.* at 8-9.) Third, she contends that the ALJ erred by "failing to assign significant weight

1

to any provider or reviewing physician who opined as to [her] non-exertional impairments." (*Id.* at 2.) In response, the Commissioner asserts that the Plaintiff did not meet her burden of proving that her narcolepsy met or medically equaled a listing, nor did she establish that there were any gaps in the record. (ECF No. 16-1, at 2.)

The Court agrees with the Commissioner that the Plaintiff did not meet her burden of proving that her narcolepsy met or medically equaled a Listing of Impairment. In addition, the ALJ did not err by failing to develop additional treatment notes or opinion evidence. The Court, therefore, grants the Commissioner's motion and affirms the decision of the ALJ.

## I.   **APPLICABLE LEGAL PRINCIPLES**

To be considered disabled under the Social Security Act, "a claimant must establish an 'inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.'" *Smith v. Berryhill*, 740 F. App'x 721, 722 (2d Cir. 2018) (summary order) (quoting 20 C.F.R. § 404.1505(a)). To determine whether a claimant is disabled, the ALJ must follow a five-step evaluation process.

At Step One, the ALJ determines "whether the claimant is currently engaged in substantial gainful activity . . . ." *McIntyre v. Colvin*, 758 F.3d 146, 150 (2d Cir. 2014) (citing *Burgess v. Astrue*, 537 F.3d 117, 120 (2d Cir. 2008)). At Step Two, the ALJ analyzes "whether the claimant has a severe impairment or combination of impairments . . . ." *Id.* At Step Three, the ALJ evaluates whether the claimant's impairment "meets or equals the severity" of one of the specified impairments listed in the regulations. *Id.* At Step Four, the ALJ uses a "residual functional capacity" assessment to determine whether the claimant can perform any of her "past relevant work despite the impairment. . . ." *Id.* At Step Five, the ALJ assesses "whether there are significant

numbers of jobs in the national economy that the claimant can perform given the claimant's residual functional capacity, age, education, and work experience." *Id.* The claimant bears the burden of proving her case at Steps One through Four. *Id.* At Step Five, "the burden shift[s] to the Commissioner to show there is other work that [the claimant] can perform." *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 445 (2d Cir. 2012) (per curiam).

In reviewing a final decision of the Commissioner, this Court "perform[s] an appellate function." *Zambrana v. Califano*, 651 F.2d 842, 844 (2d Cir. 1981). The Court's role is to determine whether the Commissioner's decision is supported by substantial evidence and free from legal error. "A district court may set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by substantial evidence or if the decision is based on legal error." *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000) (internal quotation marks omitted). The decision is supported by substantial evidence if a "reasonable mind" could look at the record and make the same determination as the Commissioner. *See Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988) (defining substantial evidence as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion . . .") (internal citations omitted). Though the standard is deferential, "[s]ubstantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Lamay v. Comm'r of Soc. Sec.*, 562 F.3d 503, 507 (2d Cir. 2009) (internal quotation marks and citations omitted). When the decision is supported by substantial evidence, the Court defers to the Commissioner's judgment. "Where the Commissioner's decision rests on adequate findings supported by evidence having rational probative force, [this Court] will not substitute [its] judgment for that of the Commissioner." *Veino v. Barnhart*, 312 F.3d 578, 586 (2d Cir. 2002).

The Commissioner's conclusions of law are not entitled to the same deference. The Court does not defer to the Commissioner's decision "[w]here an error of law has been made that might have affected the disposition of the case." *Pollard v. Halter*, 377 F.3d 183, 189 (2d Cir. 2004) (internal quotation marks omitted). "Even if the Commissioner's decision is supported by substantial evidence, legal error alone can be enough to overturn the ALJ's decision." *Ellington v. Astrue*, 641 F. Supp. 2d 322, 328 (S.D.N.Y. 2009) (citing *Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987)).

## II.   BACKGROUND

### A. Facts and Procedural History

On November 24, 2015, the Plaintiff filed an application for Title II Social Security Disability Insurance ("SSDI") benefits. (R. 254.) She alleged a disability onset date of June 30, 2015 (*id.*), claiming she could not work because of narcolepsy with cataplexy, myofascial pain syndrome, chronic back and neck pain, generalized anxiety, asthma, and allergies. (R. 94.) On July 18, 2017, she filed a Title XVI application for Supplemental Security Income ("SSI"). (R. 26.)

On February 26, 2016, the Social Security Administration ("SSA") found that the Plaintiff was "not disabled." (R. 103.) Her claims were denied on reconsideration on July 29, 2016. (R. 115.) She then requested a hearing before an ALJ, which was held on June 25, 2018. (R. 51-92.) The ALJ issued a partially favorable decision on September 5, 2018. (R. 26-40.) He concluded that the Plaintiff "was not disabled prior to July 24, 2017, but became disabled on that date and has continued to be disabled." (R. 26.) Because the Plaintiff's date last insured for SSDI purposes was September 30, 2015 (R. 28), this decision had the practical effect of allowing her SSI claim but denying her SSDI claim. (R. 39.)

The Plaintiff appealed the ALJ's SSDI decision, and the Appeals Council denied her request for review on August 23, 2019.  (R. 1-4.)  On October 23, 2019, she sought review in this Court pursuant to 42 U.S.C. § 405(g).  (ECF No. 1.)  She filed her motion to reverse and remand on February 20, 2020 (ECF No. 15), and the Commissioner filed his motion to affirm on April 20, 2020.  (ECF No. 16.)

### B.  Relevant Medical History

The medical record reflects that the Plaintiff suffers from, *inter alia*, fibromyalgia, narcolepsy, and anxiety disorders.  (*See* R. 28.)  The Court will address the Plaintiff's medical history as it relates to issues raised by the parties.

### i.  Medical Evidence

In SSDI cases, the "relevant period" for establishing disability is the time between the alleged onset of disability and the date the claimant was last insured.  *Solis v. Berryhill*, 692 F. App'x 46, 48 (2d Cir. 2017) (summary order).  The relevant time period in the present case is brief, spanning three months from the alleged onset date of June 30, 2015 (R. 94, 254) through the date last insured of September 30, 2015.  (R. 97.)  However, the Court can look to materials outside the relevant time period if it helps inform whether the Plaintiff was disabled between the two dates.  *See, e.g., Crespo v. Comm'r of Soc. Sec.*, No. 3:18-cv-00435 (JAM), 2019 WL 4686763, at *4 (D. Conn. Sept. 25, 2019) (noting that "treatment records from outside [the relevant] period may be relevant to the extent that they shed light on the claimant's condition during the period").  The Plaintiff's claims of error are primarily related to her severe impairment of narcolepsy, so this ruling will principally discuss that impairment.  Additional medical history, however, will be set forth below, as necessary to explain the Court's decision.

Prior to the relevant time period, the Plaintiff experienced symptoms of narcolepsy in 2009. (ECF No. 15-1, at ¶ 1; R. 460.)  At that time, the Plaintiff reported excessive daytime sleepiness with an irresistible urge to fall asleep anywhere, including an incident where she fell asleep at a stop light.  (R. 32, 459.)  Lab results were within normal limits, and sleep testing was ordered.  (R. 32, 460.)  A polysomnography showed no evidence of obstructive sleep apnea, but sleep latency testing showed findings consistent with narcolepsy without cataplexy.  (R. 32, 477.)  Thereafter, the claimant began treatment with a neurologist, where she was prescribed Provigil for her condition.  (R. 32, 537-51.)  Treatment notes from the neurologist indicate that he saw the Plaintiff on six occasions from February 3, 2010, until June 11, 2010.  (R. 549.)

From the time Plaintiff was prescribed Provigil until the Spring of 2015, she evidently did not seek treatment for her narcolepsy.  The record shows that she saw several doctors from April 2014 through early 2015, but her primary complaints were not related to narcolepsy.[1]  During this time, the Plaintiff successfully attended law school as a full-time student from Fall 2011 through Fall 2012, took the Spring and Summer 2013 semesters off for unknown reasons, and then returned to law school as a part-time student in Fall 2013 until Spring 2015.  (R. 78.)

---

[1]     The Plaintiff presented to Dr. Yousef Zaffarkhan at Body Works Health & Wellness on the following dates in 2014, and at each her chief complaint was back and knee pain, she tested positive for myofascitis, and narcolepsy was not mentioned: April 30 (ECF No. 15-1, at  ¶ 4; R. 1046-49), July 16 (ECF No. 15-1, at ¶ 5; R. 1050-51), August 15 (ECF No. 15-1, at ¶ 6; R. 1052-53), October 18 (ECF No. 15-1, at  ¶ 7; R. 1054-55), October 22 (ECF No. 15-1, at  ¶ 8; R. 1056-57), November 19 (ECF No. 15-1, at  ¶ 9; R. 1058-59), December 3 (ECF No. 15-1, at  ¶ 10; R. 1060-61), and December 15 (ECF No. 15-1, at  ¶ 11; R. 1062-63.) The Plaintiff presented to chiropractor Dr. Ria Tjiong at Crossover Healthcare Center on the following dates in 2015, and Dr. Tjiong reported that the Plaintiff did self-report a history of narcolepsy but that the condition was beyond the scope of his office and was not evaluated: March 30, April 3, April 13, April 24, May 29, July 10, August 27, August 31, September 7, and September 11.  (ECF No. 15-1, at ¶¶ 12, 13; R. 583.)

During the relevant time period of June 30 to September 30, 2015, the Plaintiff sought treatment for her narcolepsy from sleep specialist Dr. Muhammad Najjar—five years after she last saw a neurologist for this condition—after she noticed a worsening of her symptoms in approximately March or April 2015. (R. 32, 595.) Records were requested from Dr. Najjar from June 1, 2014—thirteen months prior to the alleged onset of disability—until the then-current date of January 22, 2016, nearly five months after the date last insured. (R. 601-602.) During this time period, the Plaintiff visited Dr. Najjar in June, July, and August of 2015 (R. 591-600), and made one trip to the emergency department in September 2015. (R. 611-613, modified by R. 608-609.)

On June 13, 2015, the Plaintiff presented to Dr. Najjar with complaints that her narcolepsy had worsened in the previous two to three months. (R. 591.) The Plaintiff reported being on Provigil at that time. (R. 593.) Dr. Najjar reported that the Plaintiff was alert and cooperative with fluent speech and intact comprehension. (*Id.*) The doctor conducted an Epworth Sleepiness Scale assessment,[2] and it provided a weightage of 17.00 (out of a possible 24.00), which can generally be interpreted as the indicating severe excessive daytime sleepiness.[3] (R. 592.) Dr. Najjar diagnosed the Plaintiff with narcolepsy without cataplexy and prescribed Xyrem. (R. 592-93.)

On July 1, 2015, the Plaintiff followed up with Dr. Najjar and reported she had "periods when she sleeps a lot and periods when she is not so sleepy." (R. 595.) She reported that the Xyrem relaxed her but did not make her sleepy. (*Id.*) In addition, she reported a recent episode of leg weakness during a tornado watch (*id.*), resulting in Dr. Najjar updating her diagnosis to

---

[2]     *See* Murray W. Johns, *The Epworth Sleepiness Scale: About the EES*, https://epworthsleepinessscale.com/about-the-ess/ (last visited Oct. 30, 2020).

[3]     The Plaintiff reported: slight chance of dozing while sitting quietly after a lunch without alcohol and in a car while stopped for a few minutes in traffic; moderate chance of dozing while sitting and reading, sitting inactive in a public place, and sitting and talking to someone; and, high chance of dozing while watching TV, as a passenger in a car for an hour without a break, and laying down to rest in the afternoon. (R. 592.)

narcolepsy with cataplexy. (R. 596.) The doctor again noted that the Plaintiff was alert and cooperative with fluent speech and intact comprehension (R. 595), and he conducted an Epworth Sleepiness Scale assessment with a resultant weightage of 20.00 indicating severe excessive daytime sleepiness.[4] (R. 596.) Dr. Najjar directed the Plaintiff to continue with an increased dose of Xyrem and started her on Ritalin. (R. 597.)

On August 8, 2015, the Plaintiff followed up with Dr. Najjar and reported that the Ritalin was working well for her despite her feeling emotional and angry at times. (R. 598.) She also reported that the Xyrem made her legs feel strange, so she independently decreased the dose. (*Id.*) The Plaintiff reported that she was not done with school and noted that she would take a break soon. (*Id.*) Dr. Najjar modified the Plaintiff's diagnosis, returning to the June diagnosis of narcolepsy without cataplexy. (R. 599.) The doctor again noted that the Plaintiff was alert and cooperative with fluent speech and intact comprehension (R. 598), and he conducted an Epworth Sleepiness Scale assessment with resultant weightage of 5.00.[5] (R. 599.) This score corresponds with the lowest category on the scale, indicating lower normal daytime sleepiness and falling within a generally accepted normal range of 0-10.[6] Dr. Najjar directed the Plaintiff to continue taking Xyrem and Ritalin for her narcolepsy.

---

[4]  *See* Johns, *supra* note 3. The Plaintiff reported: slight chance of dozing while in a car while stopped for a few minutes in traffic; moderate chance of dozing while a passenger in a car for an hour without a break, and sitting and talking to someone; and high chance of dozing while sitting and reading, watching TV, sitting inactive in a public place, laying down to rest in the afternoon, and sitting quietly after a lunch without alcohol. (R. 596.)

[5]  The Plaintiff reported: no chance of dozing while sitting and reading, sitting and talking to someone, sitting quietly after a lunch without alcohol, and in a car while stopped for a few minutes in traffic; slight chance of dozing while watching TV, sitting inactive in a public place, and lying down to rest in the afternoon; and, moderate chance of dozing as a passenger in a car for an hour without a break. (R. 599.)

[6]  *See* Johns, *supra* note 3.

In addition to Dr. Najjar's treatment notes, the record contains a note dated July 1, 2015, that he provided to the Plaintiff for her to present to her law school. The substantive body of the note stated, in its entirety:

> [The Plaintiff] carries a diagnosis of Narcolepsy, a serious medical disorder which causes her to have restless sleep at night and to be very tired during the daytime. This condition sometimes leads to sleep attacks, periods of time ranging from hours to days, time in which all she can do is sleep. This has caused her to fall behind on her work and miss classes. [The Plaintiff] is seeing me regularly now for treatment of this condition however she needs special schedule accommodations in order to function optimally during the day. Please allow for grace periods in which she can catch up on assignments and will not be penalized for missing classes. Please provide these accommodations or feel free to reach out to me if there are questions or concerns.

(R. 606.) He provided this letter before the Plaintiff began taking Ritalin for her narcolepsy, which she subsequently reported was effective at controlling her symptoms. (R. 598.)

During the relevant period, the Plaintiff also presented to the emergency department on September 17, 2015, complaining of polyarthropathy and chronic fatigue. (R. 607-617.) The record reflects that the Plaintiff reported a history of narcolepsy and the physician noted that the Plaintiff presented with multiple vague symptoms. (R. 608.) The Plaintiff reported generalized fatigue, among other symptoms, and said that she had dropped out of law school to care for her ailing father. (R. 608, 611.) She further reported an increased need for sleep which she attributed to her narcolepsy. (R. 612.) She was discharged with instructions to follow up with primary care. (R. 616.)

Following September 30, 2015—the end date of the relevant period—the Plaintiff sought treatment from other physicians for symptoms not related to her narcolepsy.[7] She did, however,

---

[7]     The record contains treatment notes for the following dates: October 6, 2015 (ECF No. 15-1, at ¶ 19; R. 618-629); October 14, 2015 (ECF No. 15-1, at ¶ 20; R. 633-634); December 4, 2015 (ECF No. 15-1, at ¶ 21; R. 649-655); December 8, 2016 (ECF No. 15-1, at ¶ 22; R. 631-632);

self-report that she had a history of narcolepsy with recent episodes of cataplexy to a rheumatologist on December 4, 2015, January 29, 2016, and March 4, 2016, and to an endocrinologist on April 4, 2016.  (*See* records cited in fn.7, *supra*.)  Her narcolepsy, however, was not the primary complaint at any of those visits, nor did she follow up with a neurologist regarding the narcolepsy or cataplexy she reported having experienced.

At the Plaintiff's hearing, the ALJ asked her counsel if she had had a chance to review the documents in the file and whether there was anything additional to add.  (R. 54-55, 59, 69.) Counsel did not indicate at any point that records related to the Plaintiff's narcolepsy were missing or incomplete.  There were, however, several discussions of records related to the Plaintiff's other conditions.  Counsel initially indicated that all of the medical records were complete (R. 54-55), but highlighted that records from a chiropractor from 2011 to 2014 were obtained at the last minute so, while they were in the record, those records were not referred to in her brief.  (R. 59.)  During the Plaintiff's testimony, the ALJ verified there were no hospitalization or institutionalization records for mental health treatment from her time overseas in 2017, during the period when the Plaintiff had a precipitous mental health decline.  (R. 69.)  The ALJ also noticed that the Plaintiff was testifying about visits to an outpatient facility with which he was unfamiliar.  (R. 71-73.) When he asked if there were records for that treatment, Plaintiff's counsel indicated that she had not thought of them until just then because they were for only a short period of time.  (R. 73, 91.) The ALJ said they were records he might want to see and agreed to keep the record open for two weeks for them to be included.  (R. 91.)

---

January 15, 2016 (ECF No. 15-1, at ¶ 23; R. 684-687); January 27, 2016 (R. 688-691); January 29, 2016 (ECF No. 15-1, at ¶ 24, R. 656-662); February 12, 2016 (R. 692-695); March 4, 2016 (ECF No. 15-1, at ¶ 25, R. 663-667); April 4, 2016 (ECF No. 15-1, at ¶ 26, R. 680-682); and May 20, 2016 (R. 696-700).

### ii. Non-Medical Evidence

At the hearing on June 25, 2018, the Plaintiff testified that her narcolepsy was unpredictable and that she would go through periods where she is "fairly normal" and periods where "it's really intense when I'm going through either psychological or physical stress." (R. 77.) She also testified that her allergies aggravated her narcolepsy. (R. 78.) She said when she would start to "feel the stress from like schoolwork and things like that, that would trigger it a lot as well." (*Id.*) The Plaintiff stated that she would run late to her 9:00 am class, "get[ting] up was a pain in itself," she would be "really, really tired," and would "feel really confused in the morning." (R. 78.) She continued, however, that "[l]ater on, when I got diagnosis of myofascial pain syndrome, my doctor said that that's like – that's a manifestation of myofascial pain syndrome. To have like a foggy brain."[8] (*Id.*)

The Plaintiff was a full-time law student from Fall of 2011 through Fall of 2013, and took off the Spring and Summer of 2013, before returning as a part-time student from Fall of 2013 through Spring of 2015. (R. 78.) It was in the Spring of 2015 that "everything started to fall apart. That's when [she] was feeling cataplexy." (Id.) At the time of the hearing, the Plaintiff had completed three previously incomplete courses and was working on a fourth and final incomplete in order to fulfill the requirements for her law degree. (R. 79-80.) She testified that she has been on several types of medication for her narcolepsy, including Provigil and Nuvigil, but when asked

---

[8]     The Plaintiff claims that her doctor informed her that her "diagnos[is] [of] myofascial pain syndrome," also known as myofascitis, is a manifestation of [her narcolepsy] condition." (ECF No. 15-2, at 4.) This claim, however, is not supported by the treatment notes. (R. 1046-63.) The treatment notes related to the Plaintiff's myofascitis diagnosis do not mention narcolepsy at all, but, instead, reflect that the Plaintiff reported that her "sleep is affected by pain." (*See e.g.*, R. 1048.)

what medications she was on at the time of the hearing, she did not list medication for her narcolepsy. (R. 80.)

Following testimony by the vocational expert, the ALJ asked the Plaintiff if she had thought of anything she wanted to add, "maybe something [she] was thinking of on [her] way here today that [they hadn't] asked [her] yet." (R. 86-87.) The Plaintiff took the opportunity to say that the narcolepsy prevented her from holding a job in the past. (R. 87.) She also commented that during the relevant period, she was living independently at a private dormitory in Chicago while attending law school. (R. 88-91.) She had problems with fellow residents, however – and she attributed those problems to her narcolepsy because she was too tired during the day to clean up after herself and clean the shared kitchen and bathroom.[9] (*Id.*)

### C. The ALJ's Decision

At Step One, the ALJ found that the claimant had not engaged in substantial gainful activity since her alleged disability onset date of June 30, 2015. (R. 28.) At Step Two, the ALJ found that, since the onset date, the Plaintiff suffered from the severe impairments of fibromyalgia, narcolepsy, and anxiety disorders. (*Id.*) He concluded that the Plaintiff's schizoaffective disorder and borderline personality disorder were not medically determinable impairments prior to her date last insured, noting that "the treatment notes do not show that the [Plaintiff] displayed signs or symptoms, or was evaluated or diagnosed, with [these disorders]" and "[t]reatment notes do not

---

[9]     The Plaintiff also described having problem with friends with whom she lived after leaving the dormitory. (R. 89.) These living arrangements, however, were from after the relevant period. The Plaintiff reported at her September 17, 2015, visit to the emergency room that she had left law school to care for her ailing father. (R. 608, 611.) She testified at the hearing that she moved out of the dormitory when she returned to Connecticut to be with her ailing father. (R. 88.) She then traveled with him to Pakistan before he passed away. (*Id.*) It was only upon returning to Chicago after the death of her father that she moved out of the dormitory and in with friends. (R. 88-89.) The Plaintiff testified that she had similar problems with her roommates as she had with her fellow dormitory residents. (R. 90-91.)

show that [the Plaintiff] displayed significant signs of bizarre behavior, disorganization, paranoia, or delusions" during that time period. (R. 29.) Later in his opinion, however, he concluded that the Plaintiff's mental impairments became both medically determinable and disabling "beginning on July 24, 2017." (R. 37.) Starting on that date, "the claimant's allegations regarding her symptoms and limitations [were] consistent with the evidence" following the "significant deterioration in her mental status in the Spring of 2017." (R. 38.)

The ALJ determined that prior to July 24, 2017, the Plaintiff retained the following residual functional capacity ("RFC"):

> [T]o perform light work as defined in 20 CFR 404.1567(b) except she could occasionally climb ramps and stairs, never climb ladders, ropes or scaffolding, and would need to avoid concentrated exposure to unprotected heights. Additionally, she would be restricted to performing simple, routine and repetitive tasks and, after learning new tasks, would be restricted to occasional interaction with coworkers.

(R. 31, 31-36.) In determining this RFC, the ALJ gave "partial weight" to the opinion of Dr. Najjar as expressed in the doctor's July 1, 2015, note. (R. 35.) The ALJ acknowledged that Dr. Najjar was "a treating source, and a specialist, affording his opinion significant consideration . . . . However, his opinion is vague, without specific function-by-function assessment of the claimant's limitations, reducing the persuasive value of his opinion. Further, his opinion is not entirely consistent with the medical record, [which showed] improvement in [the Plaintiff's] condition with medication management, without frequent episodes of cataplexy." (*Id.*)

At Step Four, the ALJ found that the Plaintiff had been unable to perform any past relevant work from June 30, 2015 onward. (R. 36.) Finally, at Step Five, the ALJ relied on the testimony of a vocational expert to find that there were jobs that existed in significant numbers in the national economy that the Plaintiff could have performed prior to July 24, 2017, including photocopy machine operator, mail clerk, and cashier II. (R. 36-37.) Accordingly, the ALJ determined that while "the claimant has been disabled . . . beginning on July 24, 2017," she "was not disabled [on

or before] the date last insured."  (R. 39.)  As noted, this decision had the practical effect of allowing her claim for Title XVI SSI benefits to proceed but denying her claim for Title II SSDI benefits.  The Plaintiff asks this Court to reverse the latter decision.  (ECF No. 15.)

## III.   DISCUSSION

The Plaintiff argues that the ALJ erred by: (1) failing to make specific findings as to the frequency of her narcoleptic attacks when conducting the Listing analysis at Step Three; (2) failing to develop the record by not obtaining certain treatment records; and (3) not seeking clarification of Dr. Najjar's medical source opinion, which assertedly caused her case to be decided with "no reliable opinion evidence as to [her] non-exertional limitations."  (ECF No. 15-2, at 2, 10.)  For the following reasons, the Court concludes that under the facts of this case, the ALJ did not err at Step Three of the analysis nor did he fail to develop the record.

### A.   The ALJ Did Not Err at Step Three of the Analysis by Not Stating a Specific Frequency of the Plaintiff's Narcoleptic Attacks.

The Plaintiff first argues that the ALJ "has an affirmative duty to make specific findings as to symptoms" when conducting Step Three of the analysis and, therefore, he "should have made specific findings as to the frequency of [the Plaintiff's] narcolepsy attacks."  (ECF No. 15-2, at 7.) Without a finding of frequency, the Plaintiff argues, the ALJ was unable to determine if the Plaintiff satisfied the Listing at Step Three.

Although there is no Listing for narcolepsy, the SSA instructs that the illness should be evaluating in accordance with Listing 11.02, Epilepsy.  Social Security Programs Operations Manual   System   (POMS),   DI   24580.005.C,   *Evaluation   of   Narcolepsy*, https://secure.ssa.gov/apps10/poms.nsf/lnx/0424580005 ("Although narcolepsy and epilepsy are

not truly comparable illnesses, when evaluating medical severity, the closest listing to equate

narcolepsy with is Listing 11.02, Epilepsy.").  The POMS further states:

> The severity of narcolepsy should be evaluated after a period of 3 months of
> prescribed treatment. . . . Also, narcolepsy is not usually treated with anticonvulsant
> medication, but is most frequently treated by the use of drugs such as stimulants
> and mood elevators for which there are no universal laboratory blood level
> determinations available. Finally, it is important to obtain from an ongoing
> treatment source a description of the medications used and the response to the
> medication, as well as an adequate description of the claimant's alleged narcoleptic
> attacks and any other secondary events such as cataplexy, hypnagogic
> hallucinations or sleep paralysis.

*Id.*

To establish a disability under Listing 11.02, a claimant must present evidence that she

suffers from a certain type of seizure, occurring at certain frequencies.  *See generally* 20 C.F.R. §

Pt. 404, Subpt. P, App. 1, § 11.02.  These frequencies range from once a month (§11.02A) to once

a week (§11.02B) to once every two months (§11.02C).  The seizures must occur for a period of

three (§11.02A, §11.02B) or four (§11.02C) consecutive months despite adherence to prescribed

treatment.  *Id*.  The Plaintiff "bears the burden of establishing that [she] meets *all* of the specified

medical criteria of a medical listing at step three." *Sena v. Berryhill*, No. 3:17-CV-912 (MPS),

2018 WL 3854771, at *3 (D. Conn. Aug. 14, 2018) (quoting *Sullivan v. Zebley*, 493 U.S. 521, 530

(1990)) (internal brackets and quotation marks omitted, emphasis in original); *see also Otts v.

Comm'r of Soc. Sec.*, 249 F. App'x 887, 888-89 (2d Cir. 2007) (summary order) (finding that the

claimant did not carry her burden to demonstrate that she met all of the definitional criteria of a

particular disorder).

An ALJ "should provide a sufficient rationale in support of his decision to find or not to

find a listed impairment" at Step Three.  *Berry v. Schweiker*, 675 F.2d 464, 469 (2d Cir. 1982) (per

curium).  An ALJ's failure to expressly articulate his determination at Step Three, however, is not

error where the later portions of the decision and the underlying record support his findings.  *See Salmini v. Comm'r of Soc. Sec.*, 371 F. App'x 109, 112–13 (2d Cir. 2010) (summary order) ("Here, although the ALJ might have been more specific in detailing the reasons for concluding that plaintiff's condition did not satisfy a listed impairment, other portions of the ALJ's detailed decision, along with plaintiff's own testimony, demonstrate that substantial evidence supports this part of the ALJ's determination."); *Solis*, 692 F. App'x at 48 ("Although the ALJ did not explicitly discuss Listing 11.14, his general conclusion (that [the claimant] did not meet a listed impairment) is supported by substantial evidence.") (citing *Berry*, 675 F.2d at 468).  Furthermore, "where there is little or no evidence in the record to support that the plaintiff meets the criteria of the listing, the ALJ's analysis is sufficient if the ALJ 'spoke to a lack of evidence in the record that those criteria were met' in addition to listing the criteria."  *Knoll v. Berryhill*, No. 3:18-cv-01912 (RAR), 2020 WL 1149994, at *3 (D. Conn. Mar. 10, 2020) (quoting *Monahan v. Berryhill*, No. 3:18-cv-00207 (JAM), 2019 WL 396902, at *5 (D. Conn. Jan. 31, 2019)).  Failure to provide an express rationale at Step Three requires remand only when a reviewing court is "unable to fathom" the ALJ's decision "in relation to the record." *Lopez v. Berryhill*, 448 F. Supp. 3d 328, 347 (S.D.N.Y. 2020) ("Remand is called for where the Court 'would be unable to fathom the ALJ's rationale in relation to evidence in the record, especially where credibility determinations and inference drawing is required of the ALJ.'") (quoting *Berry*, 675 F.2d at 469).

In this case, the ALJ found that, "[b]ased on treatment notes, the record does not support a determination that the claimant has experienced episodes or attacks of this condition at the frequency demanded by this listing."  (R. 29) (citing Dr. Najjar's treatment notes at Ex. 11F).  He therefore found "that the claimant's impairment does not meet the requirements of this listing." (*Id.*)  The ALJ did not provide an express rationale for his conclusions in that section of his opinion,

but the Court "can look to other portions of the . . . decision and to credible evidence in finding that his determination was supported by substantial evidence." *Knoll*, 2020 WL 1149994, at *3 (citing *Nieves v. Colvin*, No. 3:15-CV-01842 (JCH), 2016 WL 7489041, at *5, *6 (D. Conn. Dec. 30, 2016)) (internal quotation marks omitted).

Later in his decision, the ALJ spent two lengthy paragraphs discussing the claimant's narcolepsy from the time of her diagnosis through her date last insured:

> In terms of the claimant's narcolepsy, the record shows that the claimant has experienced symptoms of narcolepsy since 2009. However, through her date last insured [September 30, 2015], treatment notes generally show that her condition has been managed through treatment and medication management, without evidence of symptoms of severity consistent with her allegations or reported functional limitations. In 2009, the record shows that the claimant reported excessively daytime sleepiness, with an irresistible urge to fall asleep anywhere, including an incident where she fell asleep at a stop light (Ex. 1F, 6). Lab work showed the findings to be within normal limits, and a sleep testing was ordered (Ex. 1F, 7). A polysomnography showed no evidence of obstructive sleep apnea, but a sleep latency testing, showed findings consistent with narcolepsy (Ex. 1F, 24, 28). Thereafter, the claimant began treatment with a neurologist, where she was provided medication for her condition. (Ex. 5F). Subsequent medical records do not show that the claimant received significant additional treatment for her condition for several years, and show that she was capable of successfully attending and succeeding in Law School through 2015, inconsistent with her allegations regarding the severity of her narcolepsy (Ex. 19E).

> In June of 2015, the claimant began treatment with a sleep medicine specialist, reporting worsening of her narcolepsy over the past two to three months, with periods of excessive sleep, sometimes exceeding twelve hours a day. She was assessed with narcolepsy without cataplexy, was referred for an updated sleep study, and started on medication (Ex. 11F, 1-3). However, next month, the claimant reported an episode of leg weakness during a tornado watch. In examination, the claimant displayed normal strength and tone of her lower extremities, but was assessed with narcolepsy with cataplexy due to her reported episode, and her medications were increased (Ex. 11F, 6-7). By her next visit, the claimant reported that her medications were working for her condition, improving her sleep habits, and did not report further episodes of lower extremity weakness. Her medications were continued, and she was again assessed with narcolepsy without cataplexy. (Ex. 11F. 8-9).

(R. 32.)  This discussion provides a substantial evidentiary basis for concluding that the Plaintiff's narcoleptic seizures did not persist for the required number of months despite adherence to prescribed treatment.  The ALJ's conclusion that the Plaintiff did not establish all of the elements of a listing is therefore sufficiently supported by the record.

### B. The ALJ Did Not Fail to Develop the Record by Not Requesting Certain Medical Records.

The ALJ has an affirmative obligation to develop a complete and accurate medical record. "[T]he Commissioner of Social Security . . .  shall develop a complete medical history of at least the preceding twelve months for any case in which a determination is made that the individual is not under a disability." 42 U.S.C.A. § 423.  This duty exists even when the Plaintiff is represented by counsel.  *Perez v. Chater,* 77 F.3d 41, 47 (2d Cir. 1996) ("This duty exists even when the claimant is represented by counsel or, as here, by a paralegal."); *see also Corcoran v. Astrue*, No. 3:04-CV-946 (SRU), 2009 WL 189870, at *3 (D. Conn. Jan. 26, 2009) ("Although the duty exists even when the claimant is represented by counsel, . . . the ALJ is under a heightened duty where the claimant is unrepresented by counsel . . . .") (internal citations and quotation marks omitted).

In SSDI cases, the scope of an ALJ's obligation to obtain a claimant's "complete medical history" depends on when the application was filed in relation to the alleged onset of disability. 20 C.F.R. § 404.1512 (b)(1)(ii) defines a "complete medical history" as:

> [T]he records of your medical source(s) covering at least the 12 months preceding the month in which you file your application.  If you say that your disability began less than 12 months before you filed your application, we will develop your complete medical history beginning with the month you say your disability began unless we have reason to believe your disability began earlier.  If applicable, we will develop your complete medical history for the 12–month period prior to the month you were last insured for disability insurance benefits . . . .

Medical records from before or after the relevant period can be consulted when they reflect a claimant's condition during that period, but they have less probative value than records from

during the relevant period. *Crespo*, 2019 WL 4686763, at \*4. This is "because it is uncertain whether a claimant's condition *before* or *after* the relevant time period reflects the claimant's condition *during* the time period." *Id.* (emphasis in original).

The record is incomplete when it has obvious gaps or inconsistencies. *Rosa v. Callahan,* 168 F.3d 72, 79 n.5 (2d Cir. 1999). And failure to develop the record is reversible legal error. *Rose v. Comm'r of Soc. Sec.*, 202 F. Supp. 3d 231, 239 (E.D.N.Y. 2016) ("When an ALJ does not 'fully develop[ ] the factual record, the ALJ commit[s] legal error.'") (quoting *Rosa*, 168 F.3d at 80). But "where there are no obvious gaps in the administrative record, and where the ALJ already possesses a complete medical history, the ALJ is under no obligation to seek additional information in advance of rejecting a benefits claim." *Id.* (internal quotation marks omitted).

The Plaintiff argues that the ALJ erred by failing to obtain records for mental health treatment from 2004-2006 and 2011-2013 from the Illinois Institute of Technology Medical Center ("IITMC") (ECF 15-2, at 8), but the Court disagrees. These records fall well outside the relevant period of June 30, 2015 through September 30, 2015. *Cf.* 20 C.F.R. § 404.1512 (b)(1)(ii) ("If you say that your disability began less than 12 months before you filed your application, we will develop your complete medical history beginning with the month you say your disability began unless we have reason to believe your disability began earlier.") The Plaintiff has not explained how these records would shed light on her condition *during* the relevant time period. Therefore, the ALJ did not err in not obtaining the records from IITMC.

### C. The ALJ Did Not Err by Failing to Develop Additional Opinion Evidence.

In reaching his conclusions, the ALJ considered a report from a consultative examiner, Michael E. Stone, Psy.D. (R. 34-35, 552-55.) He also "evaluated the opinions of" two state agency medical consultants, Charles Kenney, M.D. and Young-Ja Kim, M.D. (R. 35.) Furthermore, he

considered the opinions of two state agency mental health consultants, Keith Burton, Ph.D., and Mary Sandra Story, Psy.D.  (R. 35.)  He assigned "great weight" only to the opinions of the two medical consultants, Drs. Kenney and Kim.  (R. 34-35.)

The ALJ also considered Dr. Najjar's July 1, 2015 note.  (R. 35, 606.)  He treated the note as medical opinion evidence, because Dr. Najjar "is a treating source" and "a specialist" whose opinions are entitled to "significant consideration under the" Social Security regulations.  (R. 35.)  Yet at the same time, the ALJ afforded the opinion only "partial weight" because it was "vague, without specific function-by-function assessment of the claimant's limitations."  (*Id.*)  The ALJ also noted that the opinion "is not entirely consistent with the medical record," which showed "improvement in [the Plaintiff's] condition with medication management, without frequent episodes of cataplexy."  (*Id.*)

The Plaintiff notes that Drs. Kenney and Kim "only opined to [her] exertional limitations, including her ability to walk, stand, lift, carry, push, and pull."  (ECF No. 15-1, at 9-10.)  Because the ALJ assigned "great weight" only to these two medical, non-mental health opinions, the Plaintiff argues that he "was left with no reliable opinion evidence as to [her] non-exertional limitations."  (ECF No. 15-1, at 9-10.)   She cites the case of *Staggers v. Colvin* for the proposition that "an ALJ who makes an RFC determination in the absence of supporting expert medical opinion has improperly substituted his own opinion for that of a physician, and has committed legal error."  (*Id.* at 10) (citing *Staggers*, No. 3:14-CV-717 (JCH), 2015 WL 4751123, at *2 (D. Conn. Aug. 11, 2015)).  She asks the Court to remand her case "so that the ALJ can rely on opinion evidence regarding [her] non-exertional impairments caused by narcolepsy, and obsessive-compulsive disorder prior to her Date Last Insured."  (*Id.* at 12.)

The Plaintiff neglects to note, however, that "it is not per se error for an ALJ to make the RFC determination absent a medical opinion." *Velazquez v. Berryhill*, No. 3:18-CV-01385 (SALM), 2019 WL 1915627, at *10 (D. Conn. Apr. 30, 2019) (quoting *Ross v. Colvin*, No. 1:14-CV-00444 (WMS), 2015 WL 4891054, at *5 (W.D.N.Y. Aug. 17, 2015)).   Indeed, the Second Circuit has held that where "the record contains sufficient evidence from which an ALJ can assess the claimant's [RFC], . . . a medical source statement or formal medical opinion is not necessarily required." *Monroe v. Comm'r of Soc. Sec.*, 676 F. App'x 5, 8 (2d Cir. 2017) (summary order) (internal quotation marks and citations omitted); *see also Tankisi v. Comm'r of Soc. Sec.*, 521 F. App'x 29, 34 (2d Cir. 2013) (summary order) ("[R]emand is not always required when an ALJ fails in his duty to request opinions, particularly where, as here, the record contains sufficient evidence from which an ALJ can assess the petitioner's residual functional capacity.").   Although ALJs are ordinarily "unqualified to assess residual functional capacity on the basis of bare medical findings," this principle has been held to apply only "in instances where there is a relatively high degree of impairment."  *Velazquez*, 2019 WL 1915627, at *10 (quoting *Palascak v. Colvin*, No. 1:11-cv-0592 (MAT), 2014 WL 1920510, at *8 (W.D.N.Y. May 14, 2014)).  "[W]here the medical evidence shows relatively little physical impairment, an ALJ permissibly can render a common sense judgment about functional capacity even without a physician's assessment."  *Id.* (quoting *House v. Astrue*, No. 5:11-cv-915 (GLS), 2013 WL 422058, at *4 (N.D.N.Y. Feb. 1, 2013)).

In this case, the record contained sufficient evidence of the Plaintiff's non-exertional limitations prior to her date last insured.  She attended law school at least part time for most of the four years leading up to Summer 2015.  While she reported that she had trouble getting to class on time, she successfully completed course work and passed each of her classes.  (R. 78, 390-98.) She contends that she was often "really confused in the morning" and had a "foggy brain."  (R.

78.)  Despite these potential limitations to the Plaintiff's ability to concentrate and focus, she successfully completed demanding law school courses.  Even so, the ALJ accounted for this in the Plaintiff's RFC by limited her to "simple, routine, and repetitive tasks."  (R. 31.)  The Plaintiff also lived independently in a private dormitory during this period.  (R. 88.)  She contends that her relationships with other residents with whom she shared common spaces including the kitchen and bathroom eventually deteriorated because she did not have the energy to clean up after cooking or keep her room clean, and there were problems stemming from the shared bathroom.  (R.  88-89.)  The ALJ, however, also accounted for this in the Plaintiff's RFC by restricting her to "occasional interaction with coworkers."  (R. 31.)   In addition, her primary care providers repeatedly noted normal mood, normal cognitive functioning, intact memory and normal thought processes throughout 2015 and 2016, and the ALJ referenced these notes in his opinion.  (R. 30, 34); *see Gentile v. Saul*, No. 3:19-CV-01479 (SALM), 2020 WL 5757656, at *4 (D. Conn. Sept. 28, 2020) ("[T]he duty to develop the administrative record is triggered 'only if the evidence before [the ALJ] is inadequate to determine whether the plaintiff is disabled.'") (quoting *Walsh*, 2016 WL 1626817, at *2); *Mariano v. Astrue*, No. 3:08-CV-1738 (JCH), 2010 WL 625022, at *11 (D. Conn. Feb. 19, 2010), *report and recommendation adopted in part sub nom. Mariano v. Soc. Sec. Admin.*, No. 3:08-CV-01738 JCH, 2010 WL 1286888 (D. Conn. Mar. 30, 2010) ("However, the Court finds 'little indication in the record suggesting a disabling mental disorder during the period in question that would have obligated the ALJ to develop the record further.'") (quoting *Schaal v. Apfell,* 134 F.3d 496, 505 (2d Cir. 1998)).

Even if this evidence had been insufficient, however, the Plaintiff would still not be entitled to remand.  Before a plaintiff can have her case remanded over an alleged insufficiency in the record, the Court must consider whether the "missing evidence is significant, and plaintiff bears

the burden of establishing such harmful error." *Parker v. Colvin*, No. 3:13-CV-1398 (CSH), 2015 WL 928299, at *12 (D. Conn. Mar. 4, 2015) (internal quotation marks and alterations omitted); *see also Santiago v. Astrue*, No. 3:10-CV-937 (CFD), 2011 WL 4460206, at *2 (D. Conn. Sept. 27, 2011) ("The plaintiff in the civil action must show that he was harmed by the alleged inadequacy of the record . . . .") (citation omitted).  In this case, any additional opinion evidence about the Plaintiff's non-exertional limitations between June 30, 2015 and September 30, 2015 – that is, between her claimed onset date and her date last insured – would be insignificant and the ALJ's failure to obtain it would be harmless.  Even if the record had been insufficient with respect to her non-exertional limitations *between* those dates, it cannot be seriously disputed that the record is adequate *after* the latter date.  (*See, e.g.,* R. 598 (record from Dr. Najjar indicating that narcolepsy had been well-controlled by medication by August 2015).)  The Plaintiff bears the burden to prove a disability "which has lasted or can be expected to last for a continuous period of not less than [twelve] months," *Smith*, 740 F. App'x at 722 (quoting 20 C.F.R. § 404.1505(a)) (quotation marks omitted), and here, the allegedly-missing evidence could (at most) establish a short-term disability spanning only the summer of 2015.  Its absence is therefore harmless.  *See e.g., Zabala v. Astrue*, 595 F.3d 402, 409 (2d Cir. 2010) (concluding that "where application of the correct legal principles to the record could lead only to the same conclusion, there is no need to require agency reconsideration") (citation and alterations omitted); *cf. Bautista v. Berryhill,* No. 3:18-CV-01247 (SALM), 2019 WL 1594359, at *7 (D. Conn. Apr. 15, 2019) (noting that "failure to address [certain opinion evidence] is harmless error if consideration of the evidence would not have changed the ALJ's ultimate conclusion"); *Johnson v. Berryhill*, No. 3:17-CV-1255 (MPS), 2018 WL 6381096, at *3 (D. Conn. Dec. 6, 2018) (holding that "[e]ven where ALJ misapplies the

treating physician rule, I need not remand where the correct application of the correct legal principles would lead to the same result").

IV.     **CONCLUSION**

For the reasons stated, the Court concludes that the ALJ's decision was supported by substantial evidence and free of legal error.  Therefore, the Plaintiff's motion to reverse the decision of the Commissioner is **DENIED**, and the Commissioner's motion to affirm is **GRANTED**.

This is not a recommended ruling.  The consent of the parties allows this magistrate judge to direct the entry of a judgment of the district court in accordance with the Federal Rules of Civil Procedure.  Appeals can be made directly to the appropriate United States Court of Appeals from this judgment.  *See* 28 U.S.C. § 636(c)(3); Fed. R. Civ. P. 73(c).  The Clerk is directed to enter judgment in favor of the Defendant and close this case.

It is so ordered this 23rd day of November, 2020.


                                                            */s/ Thomas O. Farrish*
                                              _____
                                              Hon. Thomas O. Farrish
                                              United States Magistrate Judge